UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:13-00059 |
| | ) | Judge Sharp |
| JASON GLYNN | ) | |

**MEMORANDUM**

Pending before the Court are the following Motions filed by Defendant: (1) Motion to Dismiss Counts 4, 5, 6, 7 & 8 of the Indictment (Docket No. 38); (2) Motion for Bill of Particulars (Docket No. 39); and (3) Motion to Dismiss Due to Prejudicial Pre-Indictment Delay (Docket No. 40). Those Motions have been fully briefed by the parties and, for the reasons that follow, will be denied.

**I. Background**

On March 28, 2013, a federal grand jury returned an eight-count indictment against Defendant. Count One alleges that Defendant and others, including Jamie Little ("JL") and Leo Rice (who are identified in the Indictment solely by their initials), conspired to commit mail fraud. That fraud allegedly began in or around November 2009, and continued until around October 2011. Count Two alleges that, as a part of the scheme, Defendant committed mail fraud on or about May 22, 2011. Count Three alleges Defendant committed aggravated identity theft on or about February 28, 2011. Finally, Counts Four through Eight allege bank fraud.

According to the Indictment, Defendant was a Claims Adjuster for Western Express, a trucking company based in Nashville, Tennessee. JL was also a claims adjuster and administrator at Western Express, and LR worked for the trucking company in recruiting and dispatch.

1

Accident claims valued at $10,000 or less were handled internally at Western Express, and Defendant's responsibilities included evaluating and processing such claims. The essence of the Indictment is that Defendant, JL, and LR devised a scheme to defraud Western Express by falsifying and submitting fake accident claims to Western Express for payment. Among the particulars, it is alleged that (1) individuals were recruited to serve as claimants to file false claims arising from accidents that either did not occur or did not involve the claimant; (2) paperwork purporting to settle the claims was falsified and submitted to Western Express for payment; (3) settlement moneys were split between the claimants and conspirators; (4) endorsement signatures were forged on checks issued by Western Express and placed into Defendant's personal bank account; and (5) sham corporations were created to solicit payments from Western Express.

After the alleged fraud was discovered, Western Express contacted both state and federal authorities. It also instituted a civil suit against Defendant, and he counter-sued claiming sexual harassment, retaliation and a hostile work environment.

## II. Motion to Dismiss Due to Prejudicial Pre-Indictment Delay

Because it is potentially dispositive, the Court begins with Defendant's request for dismissal due to pre-indictment delay.

Statutes of limitations, "which provide predictable, legislatively enacted limits on prosecutorial delay," are the primary safeguard against "overly stale criminal charges." United States v. Lovasco, 431 U.S. 783, 789 (1977). Nevertheless, a "statute of limitations does not fully define the [defendant's] rights with respect to the events occurring prior to indictment," United States v. Marion, 404 U.S. 307, 324 (1971) and, "[i]n certain cases, the Due Process Clause protects against preindictment delay," Parker v. Burt, 595 F. App'x 595, 601 (6th Cir. 2015).

"In this circuit, dismissal for pre-indictment delay 'is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage.'" United States v. Schaffer, 586 F.3d 414, 424 (6th Cir. 2009) (quoting United States v. Greene, 737 F.2d 572, 574 (6th Cir. 1984)). "'The standard for pre-indictment delay is nearly insurmountable, especially because proof of actual prejudice is always speculative.'" United States v. Montgomery, 491 F. App'x 683, 691 (6th Cir. 2012) (quoting United States v. Rogers, 118 F.3d 466, 477 n. 10 (6th Cir. 1997)).

Defendant bears the "heavy burden to prove that pre-indictment delay caused actual prejudice." United States v. Wright, 343 F.3d 849, 860 (6th Cir. 2003). "'Bare assertions, without supporting evidence, are not sufficient to demonstrate prejudice.'" Montgomery, 49 F. App'x at 691 (quoting United States v. Vaughn, 444 Fed. App'x 875, 879 (6th Cir. 2011)).

Defendant relies upon the following time line to support his claim that the Government took too long to indict:

1) November 2009 through October 2011 – crimes allegedly occur

2) October 6, 2011 – Western Express reports alleged fraud to Nashville police

3) October 13, 2011 – E-mail indicates that Western Express Claims Manager and Vice President believes "best bet is to present our case to the US district attorney's office as interstate insurance fraud"

4) November 2, 2011 – Western Express files civil complaint against Defendant alleging fraud

5) January 27, 2012 – Federal agent interviews Jamie Little about alleged fraud who, in turn, implicates Defendant

6) March 15, 2012 – Defendant files civil complaint against Western Express

7) May 23 & 24, 2012 – Defendant responds to interrogatories and production requests

3

8) July 11, 2012 – Matthew Neal, Western Express's Recruiting Director dies in a house fire

9) August 14, 2012 – Counsel for Western Express emails Defendant's counsel in civil case advising that Western Express has been working with federal agents on a prosecution and providing the government with discovery. The following day, Government provides a target letter to Defendant's attorney in civil case

10) August 16, 2012 – Counsel moves for stay of civil proceedings

11) January 15, 2013 – Western Express meets with federal agents to provide and assist in review of discovery materials from civil case

12) March 28, 2013 – Defendant is indicted

(Docket No. 68 at 4-5).

Neither the delay reflected by the time line, nor Defendant's arguments come close to establishing either that he suffered substantial prejudice due to the delay. Nor do they show that the Government intentionally dragged its feet in order to gain a tactical advantage.

It is hardly uncommon that criminal charges follow a year or two after the completion of an alleged crime. In fact, if "[p]reindictment delay of two years . . . is generally insufficient to presume substantial prejudice," Parker, 595 F. App'x 602 (collecting cases), then a delay of 17 months is even less sufficient,[1] particularly in a case where Defendant himself has moved for four continuances over two years due to the "complexity" of the case.

Nor is it unheard of for criminal charges to be lodged after the completion of other proceedings. "[T]he mere fact that a federal indictment is not the first salvo in a chain of proceedings

---

[1] The Court rejects Defendant's argument that the "delay was more egregious than the seventeen (17) month delay from October 2011 to indictment in March 2013, because alleged acts occurred earlier," and "some allegations were over three (3) years old." (Docket No. 68 at 3). True, the conduct may have gone on for years before it was discovered, but that cannot factor into the delay analysis, unless (1) one assumes that the Government can and must investigate criminal conduct before it is known; or (2) the Fifth Amendment requires that the Government act with varying dispatch depending on how far back in time then-unknown discrete acts that form the basis for the conspiracy charge go.

4

arising out of the same nucleus of facts cannot itself create an inference of bad faith, lest it be the rule that the federal prosecutor must always be the first to prosecute." United States v. Davis, 231 F. Supp.2d 701, 709 (S.D. Ohio 2002).  After all, "[p]rosecutors have 'broad discretion' in deciding whom to prosecute and which charges to bring," United States v. Gravley, 587 Fed. App'x 899, 918) (6th Cir. 2014) (quoting, United States v. LaDeau, 734 F.3d 561, 565 (6th Cir. 2013)),  and the prosecutor in this case could have waited to see how the civil case played out, if he so chose.  See, United v. DeCologero, 530 F.3d 36, 78 (1st Cir. 2008) ("prosecutors retain discretion to delay charges until investigations are complete and all other considerations have been weighed"); United States v. Carmany, 901 F.2d 76, 78 (7th Cir. 1990) ("prosecutorial discretion allows the federal prosecutor to await final disposition of [state] charges before proceeding").

Moreover, any suggestion that the Government was required to jump on the case and indict Defendant as soon as Western Express apprised it of the alleged fraud is wrong under the law and ignores practicality. The Supreme Court has explained:

> It requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself[.]". . . From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. . . . From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited.  And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of

5

the responsible parties or some of the criminal acts.

Lovasco, 431 U.S. 783, 790-92.

In this case, the Government asserts that it "was not involved in the civil litigation between Western Express and Defendant, and, indeed did not even receive the civil complaint and related discovery until January 13, 2013, more than five months after Defendant was notified that he was a target of a federal criminal investigation." (Docket No. 53 at 6). It also claims the "evidence crucial to the criminal case – including witness grand jury testimony, witness proffers with the U.S. Attorney's Office, and vital bank records – were not obtained by the Government until the months prior to the Indictment," and points out that the prosecutor in this case did not join the United States Attorney's Office until August 26, 2012. (Id. at 10). The Court has no reason to doubt the explanations provided by the Government, and Defendant has provided none. See United States v. Thomas, 404 Fed. App'x 958, 961 (6th Cir. 2010) ("'investigative delay' is a valid reason for delay"); United States v. Brown, 959 F.2d 63, 66 (6th Cir. 1992) ("a defendant's Fifth Amendment due process rights are generally not implicated where the government offers a valid reason for the delay").

As the Government points out in its brief, Defendant's arguments are long on speculation and conjecture, but short on supporting evidence, and "[t]o the extent that Defendant has any concrete facts or details to support his motion, he certainly could have described them in the 5+ page section of the Motion for Dismissal or included relevant documents or affidavits among the numerous exhibits to his motion[.]" (Id. at 13 n.4). Despite those observations, Defendant does little to shore up the gaps in his reply, and instead argues that "counsel set forth a brief factual background and several exhibits, to illustrate relevant dates and length of delay, with the expectation of presenting

6

additional evidence at a hearing." (Docket No. 68 at 1).

"A trial court has 'wide discretion in determining how it receives evidence on a motion to dismiss based upon pre-indictment delay.'" United States v. Stoll, 2011 WL 765949, at *2 (S.D. Fla. Feb. 25, 2011) (quoting, United States v. Valona, 834 F.2d 1334, 1340 (7th Cir. 1987)). There is no absolute right to an evidentiary hearing on a claim asserting excessive delay in prosecution. See United States v. Labine, 1989 WL 72473, at *2-3 (6th Cir. July 3, 1989) (court did not err in denying dismissal and evidentiary hearing on alleged pre-indictment delay where defendant could not demonstrate that he met either prong of test); United States v. Rice, 550 F.2d 1364, 1369 (5th Cir. 1997) (denial of evidentiary hearing not erroneous where delay claim based on "[s]peculative assertions, such as allegations of lost witnesses, ensuing indigency, failure of memory, and general inability to defend oneself due to the delay"); United States v. Jaunich, 2014 WL 1026331, at *11 (D. Minn. Mar. 14, 2014) (evidentiary hearing on pre-indictment delay not required where not supported by "allegations of sufficient definiteness"). Moreover, a hearing is not required where there is no showing of actual prejudice, one of the two prongs necessary to establish a pre-indictment delay claim. United States v. Schaefer, 859 F. Supp.2d 397, 414 n.19 (E.D.N.Y. 2012).

Defendant has presented nothing from which this Court can conclude that an evidentiary hearing would be fruitful or worthwhile. He argues that his defense has been prejudiced because, during the delay between the end of the alleged crimes and his indictment, "one critical witness" has died. More specifically, he asserts that Matthew Neal, who died in a house fire on July 11, 2012, could have testified that Defendant sold high-end watches, and that Defendant introduced the claimants in the five bank fraud counts (to whom Defendant claims to have sold watches) to Mr. Neal. More generally he argues that "many of his claimants involved in accidents with the trucking

company were themselves over-the-road truck drivers, with frequently changing addresses or transient lodging, including individual to whom he sold watches," and "the government's delay of more than a year prejudiced the defendant's ability to locate claimants[.]" (Docket No. 68 at 12).

To be sure, "[i]f witnesses die or disappear during a delay, the prejudice is obvious," Barker v. Wingo, 407 U.S. 514, 532 (1972), but "[i]t's not as if delay always favors the prosecutor, and so always supports a speedy-trial claim," United States v. Richardson, 780 F.3d 812, 818 (7th Cir. 2015).[2] Moreover, "[i]n this circuit, '[w]hen the government prosecutes a case with reasonable diligence, a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay.'" United States v. Young, 657 F.3d 408 (6th Cir. 2011) (quoting United States v. Howard, 218 F.3d 556, 564 (6th Cir. 2000)).

Whether Mr. Neal would have testified on behalf of Defendant will forever be speculative. See United States v. Randolph, 2011 WL 5921455, at *4 (N.D. Ga. Nov. 2, 2011) (prejudice cannot be assumed where potential witness dies in the absence of showing that witness would have testified on defendant's behalf). Even if he would have, Defendant's position that he sold watches to numerous truckers belies the suggestion that Mr. Neal's testimony was the only (or even best) source for this information. That they may be transient and frequently change addresses remain true, regardless of whether the indictment was returned months or years after the alleged crimes.

Moreover, "[a]bsent an intent on the [Government's] part to delay prosecution in order to gain an advantage over the defendant, no amount of prejudice can justify dismissing a case for pre-indictment delay," Langford v. Warden, 593 F. App'x 422, 434 (6th Cir. 2014), and there is nothing to suggest that the Government was hoping that witnesses would disappear or die before

---

[2] The Court notes that most cases discuss post-indictment as opposed to pre-indictment delay, but those cases are useful by analogy.

8

charges were filed. United States v. Thomas, 404 F. App'x 958, 961 (6th Cir. 2010) ("Witness unavailability constitutes prejudice only if the defendant shows that the delay relates to the witness's absence"). Mr. Neal died within nine months of the detection of the alleged scheme, and the possibility that Defendant could have been indicted and brought to trial within that time period is likely none, particularly since Defendant has sought continuances numerous times after the Indictment was returned.

Apart from the alleged unavailability of witnesses, Defendant argues his "defense was prejudiced by the government declining to advise that [him] of its criminal investigation from on or about October 2011 to August 2012, while it knew the civil case was proceeding, thereby allowing the government to gain discovery, advance notice of defenses, answers to interrogatories and other prejudicial information the government would not have had in a criminal prosecution." (Docket No. 68 at 6-7). He also "contends the timing of the target letter is a strong indicator of bad faith, in the context of ongoing civil litigation, of the type . . . questioned" in United States v. Kordel, 397 U.S. 1 (1970). (Id. at 7).

Leaving aside that a prospective defendant has no constitutional right to a target letter "[b]ecause target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination [and] potential-defendant warnings add nothing of value to protection of Fifth Amendment rights," United States v. Washington, 431 U.S. 181, 189 (1977), Kordel itself states that a defendant in a civil case "without question . . . [can] invoke[] his Fifth Amendment privilege against compulsory self incrimination." Id. at 7. See also, Kastigar v. United States, 406 U.S. 441, 444 (1972) (The "privilege against compulsory self-incrimination. . . can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory"); Fieger v.

9

U.S. Attorney Gen'l, 542 F.3d 111, 1120 (6th Cir. 2008) (same). Moreover, Kordel is wholly inapposite.

Kordel involved a situation in which prosecutors utilized information obtained in a civil proceeding brought by the Food and Drug Administration to obtain criminal misbranding convictions against two of the corporation's officers. The Supreme Court upheld the use of parallel civil and criminal proceedings, and found no violation of the company vice-president's Fifth Amendment rights, even though the answers he gave to the government's interrogatories in the civil proceedings were subsequently used at the criminal trial.

Kordel's holding obviously does not help present Defendant and so he relies on what the Supreme Court did not decide. Specifically, the Supreme Court wrote:

> We do not deal here with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution.

Id. at 11-12.

This is too thin reed on which to base dismissal. Not only are none of those scenarios presented here (the Government did not bring the civil case, from all outward appearances Defendant had counsel in the civil action, and no special circumstances have been presented), that language in Kordel sets forth hypotheticals and is dicta. United States v. Mahaffy, 446 F. Supp.2d 115, 124 (E.D.N.Y. 2006); see also, United States v. Burke, 2012 WL 3062756, at *7 (E.D. Wis. July 26, 2012) (court stating that it "found no decision dismissing an indictment pursuant to the Kordel dicta based on parallel civil and criminal actions brought by a private party and the government").

"The burden is on the defendant to show 'that the delay between the alleged incident and the indictment was an intentional device on the part of the Government to gain a decided tactical advantage in its prosecution.'" Schaffer, 586 F.3d at 425-26 (quoting Greene, 737 F.2d at 574). Defendant has not carried that burden in this case, and his request for dismissal based on pre-indictment delay will be denied.[3]

### III. Motion to Dismiss Counts 4, 5, 6, 7 & 8

In Count Four through Eight of the Indictment, Defendant is charged with bank fraud in violation of 18 U.S.C. § 1344, which provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Specifically, it is alleged that, as a part of his scheme and artifice to defraud Western Express through the submission of falsified paperwork, Defendant received checks that he signed and deposited into his own account. Each of the five counts is based on a separate identified check.

Defendant seeks dismissal of these counts, arguing that the allegations suggest "garden

---

[3] This ruling does not preclude Defendant from re-asserting his request after trial. See United States v. Gulley, 526 F.3d 809, 820 (5th Cir. 2008) (citation omitted) ("'the district court . . . should carry [a motion to dismiss for pre-indictment delay] with the case, and make the determination of whether actual, substantial prejudice resulted from the improper delay in light of what actually transpired at trial"); United States v. Jakisa, 2015 WL 1810259, at *8 n.7 (D. Minn. April 21, 2015) (noting that defendant could renew his motion to dismiss on based preindictment after trial); United States v. Drayton, 2006 WL 758742, at *2 (W.D. Va. Mar. 23, 2006) (same).

variety" fraud, not bank fraud. In this regard, he contends that he "did not use false pretenses as the 'means' by which to induce a bank employee to deposit the check"; rather, the checks were "deposited by means of 'true' pretenses, to wit, he presented valid checks issued from Western Express and Pinnacle Bank, validly endorsed by Jason Glynn, for deposit in to his own true accounts." (Docket No. 66 at 3). This position, Defendant insists, is supported by the following "critical" and "uncontested" facts: "(1) the checks in these counts were valid checks issued by Western Express, Inc., from their Pinnacle Bank accounts; (2) the checks were endorsed by Mr. Glynn in his own true name; (3) the checks were presented by Mr. Glynn to a teller at his own bank, Suntrust, for deposit in to his own bank accounts, in his true name; (4) Mr. Glynn made no attempt to conceal his identity, and no attempt to conceal the nature of these deposits." (Id.).

Conspicuously absent from Defendant's presentation is any reference to the allegation in the Indictment that he "took possession of the checks issued by Western Express and fraudulent endorsed the checks by signing his own name and forging the signature of the individuals whose names appeared on the checks." (Docket No. 3, Indictment at 10 ¶ 7). This allegation, which the jury may find to be a fact at trial, takes this case outside the holding of United States v. Rodriguez, 140 F.3d 163 (2nd Cir. 1998), on which Defendant relies.

Contrary to Defendant's assertion, Rodriguez was not based on a "strikingly similar set of facts." (Docket No. 66 at 4). Rodriguez involved a situation where defendant fraudulently received checks from a company, endorsed those checks, and placed them into her own account. "There [wa]s no evidence that [defendant] engaged in a deceptive course of conduct as to the bank," and "[a] course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false of fraudulent pretenses."

12

Rodriguez, 140 F.3d at 168.

Here, the allegation is not just that Defendant hoodwinked Western Express into cutting him a check, which he then placed into his own bank account. Rather, the allegation is that he presented the check to the bank with a forged signature. Not only that, the Government has indicated that it expects to prove at trial that "the names and addresses listed in the 'payee' section of these checks were fabricated . . . out of thin air." (Docket No. 50 at 2-3). Thus, even if, as Defendant argues, Rodriguez should be read as standing for the proposition that "[w]here a defendant obtains a valid check by means of fraud, it may indeed be a fraud against the issuer of the check, but is not 'bank fraud' because the bank employee is simply depositing a 'bearer instrument' negotiable by the party who possesses the check," (id.), his reliance on that case is misplaced.

Defendant's reliance on Loughrin v. United States, 134 S.Ct. 2384 (2014), which involved a scheme to present altered and forged checks to Target stores, is also misplaced. If anything, that decision supports the conclusion that the bank fraud charges in this case are appropriate.

Defendant relies on Loughrin's citation to Rodriguez for the statement that "[o]ne might think the Federal Government would never use the bank fraud statute to prosecute . . . ordinary frauds just because they happen to involve payment by check rather than cash." Id. at 2392 n.5. However, the sole question presented was "whether the Government must prove that a defendant charged with violating [18 U.S.C. § 1344(2)] intended to defraud a bank," id. at 2387, and the Court found that it need not. Even so, the Supreme Court considered whether presenting a forged check was within the bank fraud statute and found that it was, writing:

> Section 1344(2)'s "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control. That occurs, most clearly, when a defendant makes a misrepresentation to the bank itself—say, when he attempts to

> cash, at the teller's window, a forged or altered check. In that event, the defendant seeks to obtain bank property by means of presenting the forgery directly to a bank employee. But no less is the counterfeit check the "means" of obtaining bank funds when a defendant like Loughrin offers it as payment to a third party like Target. After all, a merchant accepts a check only to pass it along to a bank for payment; and upon receipt from the merchant, that check triggers the disbursement of bank funds just as if presented by the fraudster himself. So in either case, the forged or altered check— i.e., the false statement—serves in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property.

Id. at 2393 (footnote omitted).

In this case, the means by which Defendant obtained money from his bank was through the use of a forged payee's name, or so a reasonable jury could find. Accordingly, his Motion to Dismiss the bank fraud counts will be denied.

### IV. Motion for Bill of Particulars

Under Rule 7 of the Federal Rules of Criminal Procedure, "[t]he court may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). "The function of a bill of particulars is to 'to minimize surprise and assist [the] defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes." United States v. Crayton, 357 F.3d 560, 568 (6th Cir. 2004) (quoting United States v. Salisbury, 983 F.2d 1369, 1375 (6th Cir. 1993)). "A bill of particulars 'is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial.'" Id. Further, a bill of particulars is generally unnecessary where "indictment provide[s] the general dates of the falsifications, and the defendant[s] [have] sufficient notice of their suspected roles in the fraud." United States v. Younes, 194 F. App'x 302, 311 (6th Cir. 2006).

"The decision whether to grant a motion for a bill of particulars lies within the district court's discretion[.]" United States v. Robinson, 390 F.3d 853, 867 (6th Cir. 2004). This court will exercise

that discretion by denying Defendant's request.

Though couched as a Motion for a Bill of Particulars, Defendant's Motion in parts reads more like interrogatory requests in a civil case. For example, he requests:

> (A) As to Count 3 (Aggravated Identity Theft) the defense requires additional specificity as to how the offense was allegedly committed:
> (1) Is the government contending that the "name and forged signature" at issue in Count Three, paragraph 2, is that of "PAW", known as Princess Ann Wilbanks, on a signed release dated February 28th, 2011?
> (2) If so, is the Government alleging that Mr. Glynn himself forged the signature at issue in Count Three, paragraph 2?
> (3) If the Government is not alleging that Mr. Glynn himself forged the signature, is the Government instead alleging that another alleged co-conspirator forged the signature, and if so, who is accused of doing so, whether it is Jamie Little or another person?
> (4) If Jamie Little or another person allegedly forged the Wilbanks signature, what specific acts is the Government alleging Mr. Glynn committed to be liable for actions of another under 18 U.S.C. § 2 and § 1028A(a)(1)?

(Docket No. 39 at 5). Later, he requests:

> B) As to all counts, and all discovery materials, the defense seeks a bill of particulars identifying each and every allegation of a fraudulent or forged signature, or handwriting, whether by Defendant Glynn personally or by another:
> (1) Identify each signature or writing that Mr. Glynn is alleged to have forged himself, in any claim, check, or in any document.
> (2) Identify each signature that an alleged co-conspirator, including alleged co-conspirators Rice or Little, is believed to have forged in any claim, check, or in any document.
> (3) Identify any evidence, analysis, or expert report that supports the allegation that Mr. Glynn forged any specific signature or writing.
> (4) Identify any expert, report, or other foundational basis, for the government to argue at trial that Mr. Glynn forged the signatures of the "individuals whose names appeared on the checks" in Counts 4-8, as alleged in Counts Four Through Eight, paragraphs 6 and 8 (Docket No. 3).

(Id. at 9). In yet a further request, Defendant seeks specific details about how he is alleged to have accessed or deleted files on the AS/400 server which is maintained, not by the Government, but by Western Express.

15

"[T]he test in ruling on a motion for a bill of particulars is whether providing such details is necessary to the preparation of the defense and avoidance of prejudicial surprise." United States v. Musick, 291 F. App'x 706, 724 (6th Cir. 2008). "The bill of particulars is not intended as 'a means of learning the government's evidence and theories,'" nor is its purpose "to discover all of the overt acts that might be proven at trial." Id. (citation omitted).

Here, Defendant's requests go far beyond the scope of that which is properly the subject of a bill of particulars. Though not conceding the overbreadth of his initial requests, he narrows them to more generalized categories in his reply brief.

With respect to the identity theft alleged in Count Three relating to "PAW" (who the parties appear to agree is Princess Wilbanks), Defendant asserts that "whether [he] is alleged to have forged Wilbanks' signature [is] the very *actus reus* of the offense charged." (Docket No. 67 at 4). Therefore, he argues, "[i]f the government alleges that [Defendant] forged the signature, the defense will pursue experts and investigation to prove that is not true," but if alleged co-conspirator Little "forged the 'PAW' signature herself, it provides a defense to this count, and others as well[.]" Id.

Contrary to Defendant's assertion, the "*actus reus*" of Count Three is not forgery. Rather, Defendant is specifically alleged to have used "a means of identification of another person, that is, a name and forged signature" to commit mail fraud. Further, the Government has flatly admitted that it "does not know with certainty who personally forged Wilbanks' signature, and its "theory," in keeping with the clear language of the Indictment is that Defendant "'used' Wilbanks' means of identification without lawful authority[.]" (Docket No. 52 at 6). No further detail is necessary to explain the nature of the charge, or to avoid prejudicial surprise.

As for the remaining charges, Defendant argues that he "needs to know specific instances of

16

forgery [that] he allegedly committed," and points out that, during discovery, the Government provided an expert forensic handwriting analysis report. However, the report in question was prepared by an expert retained by Western Express in the civil action, and the Government has indicated that it has not consulted any handwriting expert in this case, nor does it "intend to rely on any expert handwriting analysis at trial." (Docket No. 52 at 6).

Moreover, the Government reiterates that it does not know who signed certain documents and Defendant's request would therefore require "the Government to speculate as to whose handwriting appears on certain documents." (Id.).[4] Given these representations, it would appear fruitless for the Government to respond to requests to which it does not know the answer. Nevertheless, and while it does not appear to be the case, to the extent the Government is claiming, and intends to argue and prove at trial, that Defendant forged signatures on any specific documents (other than the checks identified in Counts Fourth through Eight), as opposed to asserting that Defendant *may* have forged the documents or someone else did, it will be required to so notify Defendant so that he can marshal evidence to rebut any such contention.

Finally, Defendant observes that the Indictment repeatedly refers to the falsification of paperwork, and he questions whether that is to be taken literally, or also encompasses digital files. He claims he "cannot emphasize enough the importance of this distinction, which goes to the heart of the case," as "[t]here is a major difference between a fraud committed by a digital computer 'hack' and one committed on paper[.]" (Docket No. 67 at 10).

This Court does not read the Indictment as suggesting acts indicative of "computer hacking" or "entering a computer system and manipulating digital data," which are the phrases used by

---

[4] This assertion presumably does not apply to Counts Four through Eight because those counts specifically alleged that, as a part of the scheme, Defendant forged the payee's signatures on the checks.

Defendant. In fact, as the Government points out, "the Indictment does not refer to or rely on any AS/400 server or any AS/400 digital files." (Docket No. 39 at 12). Additionally, the government states that it "does not possess these AS/400 digital files, nor has it examined them." (Id. at 7). As a consequence, it would appear that Defendant seeks information on matter that are not in issue, making the answering of a bill of particular on these matters an exercise in futility. Nevertheless, to the extent that the government is claiming, or intends to argue and prove at trial, that Defendant manipulated digital files or otherwise engaged in computer "hacking" in relation to the charges against him, the Government will be required to so inform Defendant.

## V. Conclusion

On the basis of the foregoing, Defendant's pending Motions will be denied. However, the denial of his Motion to Dismiss for Pre-Indictment delay will be without prejudice to re-asserting it after trial. Further, the Government will be required to respond to Defendant's requests in his Motion for a Bill of Particulars only if it is claiming that Defendant forged specific document (other than the checks identified in Counts Four to Eight), and/or that he engaged in the manipulation of computer files.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE