# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:13-00059 |
| | ) | Judge Sharp |
| JASON GLYNN | ) | |

## MEMORANDUM

After a 4½-day trial, a jury acquitted Defendant Jason Glynn of conspiracy to commit mail fraud (Count 1), mail fraud (Count 2), and aggravated identity theft (Count 3), but convicted him on five counts of bank fraud (Counts 4-8). Defendant has filed a Motion for Judgment of Acquittal (Docket No. 137), as well as a Motion for New Trial (Docket No. 136).

The standards governing Defendant's Motions differ markedly. It is the difference in those standards which lead this Court to conclude that Defendant's Motion for Judgment of Acquittal must be denied, but that the Court will benefit from oral argument on his Motion for a New Trial.

## I. Background

The Court assumes familiarity with the trial and sets forth the following simply to place the parties' arguments in context.

Defendant was a Claims Adjuster for Western Express, a Nashville, Tennessee trucking company. Defendant's responsibilities included evaluating and processing accident claims valued at $10,000 or less. The essence of the Indictment was that Defendant and others devised a scheme to defraud Western Express by falsifying and submitting fake accident claims to Western Express for payment. More particularly, it was alleged that (1) individuals were recruited to serve as claimants to file false claims arising from accidents that either did not occur or did not involve the

1

claimant; (2) paperwork purporting to settle the claims was falsified and submitted to Western Express for payment; (3) settlement moneys were split between the claimants and conspirators; (4) endorsement signatures were forged on checks issued by Western Express and placed into Defendant's personal bank account; and (5) sham corporations were created to solicit payments from Western Express.

After the alleged fraud was discovered, Western Express contacted both state and federal authorities. It also instituted a civil suit against Defendant.

Like Defendant, Jamie Little was a Claims Adjuster at Western Express; Leo Rice worked for the trucking company in recruiting and dispatch. Both are alleged co-conspirators of Defendant but were identified only by their initials in the Indictment.[1] Both testified against Defendant at trial.

The bank fraud counts on which Defendant was convicted alleged the following:

COUNTS FOUR THROUGH EIGHT

1. Paragraphs 1 through 7 of Count One, Paragraphs 1 through 9 of Count Two, and Paragraphs 1 through 2 of Count Three are hereby incorporated and realleged as if fully set forth herein.

2. Pinnacle Bank is Federal Deposit Insurance Corporation ("FDIC") insured and maintained funds in its custody and control on behalf of Western Express.

3. Beginning in or around November 2009 and continuing until in or around July 2010, in the Middle District of Tennessee and elsewhere, the defendant, JASON GLYNN, knowingly and with the intent to defraud, executed and attempted to execute a scheme and artifice to defraud Western Express and to obtain the monies, funds and other property under the custody and control of Pinnacle Bank, by means of material false and fraudulent pretenses, representations, and promises.

4. It was part of the scheme that JASON GLYNN submitted falsified paperwork to Western Express concerning false accident claims purportedly arising from automobile accidents that either never occurred or that had occurred but did not

---

[1] In separate cases, Rice and Little were charged by way of a felony Information with conspiracy to commit mail fraud in relation to the alleged Western Express scheme.

involve the named claimants.

5. It was part of the scheme that JASON GLYNN caused Western Express to issue checks, payable on its Pinnacle Bank account, in the names of the individuals listed on the falsified paperwork.

6. It was further part of the scheme that JASON GLYNN took possession of the checks issued by Western Express and fraudulently endorsed the checks by signing his own name and forging the signature of the individuals whose names appeared on the checks.

7. It was further part of the scheme that JASON GLYNN deposited the fraudulently-endorsed checks into a SunTrust Bank account in his name and under his control, and caused funds in the custody and control of Pinnacle Bank to be transferred to that account.

8. On or about the dates set forth below, in the Middle District of Tennessee and elsewhere, defendant JASON GLYNN executed and attempted to execute the scheme and artifice as set forth above, in that the defendant deposited the following checks, each being a separate count of this Indictment, into a SunTrust Bank account in his name and under his control:

| Count | Date | Check Number | Amount |
|---|---|---|---|
| 4 | 12/28/09 | 201647 | $9,350.73 |
| 5 | 4/5/2010 | 205287 | $9,438.84 |
| 6 | 2/24/2010 | 205254 | $9,861.23 |
| 7 | 6/14/2010 | 212476 | $9,760.08 |
| 8 | 7/6/2010 | 212482 | $9,723.00 |

All in violation of Title 18, United States Code, Sections 1344 and 2.

(Docket No. 3 at 9-10).

The first check was supposedly issued to Jamie Garver in Yakima, Washington; the second to Jerry Keller in Hopkinsville, Kentucky; the third to Brad Anderson of Atlanta, Georgia; the fourth to Jamie Ganken in Citrus Hills, California; and the last to Jared Sikes of Spring Hill, Texas. All five checks were drawn on Western Express's Pinnacle National Bank account, and all were endorsed

by Defendant and placed in his personal SunTrust bank account.

The bank fraud statute under which Defendant was charged in Counts Four through Eight provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344. "To obtain a conviction for bank fraud under 18 U.S.C. § 1344, the government must demonstrate three elements: '(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC.'" United States v. Warshak, 631 F.3d 266, 312 (6th Cir. 2010) (quoting United States v. Everett, 270 F.3d 986, 989 (6th Cir. 2001)).

In the counts of conviction, Defendant was also charged with aiding and abetting under 18 U.S.C. § 2, which provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

"'[T]he essential elements of aiding and abetting are (1) an act by the defendant that contributes to the commission of the crime, and (2) an intention to aid in the commission of the crime.'" United

States v. Graham, 622 F.3d 445, 450 (6th Cir. 2010) (quoting United States v. Davis, 306 F.3d 398, 412 (6th Cir. 2002)).

## I. Motion for Judgment of Acquittal

Defendant's 15-page Motion for Judgment of Acquittal is wide-ranging, incorporating as it does his 43-page Motion for New Trial.[2] Nevertheless, he presents what may be fairly characterized as three overarching themes. First, he claims that the evidence was "legally insufficient" given the "false and perjerious testimony from numerous witnesses," the introduction of hearsay documents, and the giving of an improper "special jury instruction." (Docket No. 137 at 5-6). Second, Defendant argues that the jury returned irreconcilable and inconsistent verdicts. Third, he contends that the Government's bank fraud proof was "legally insufficient to sustain the bank fraud counts pursuant to precedent." (Id. at 7). Given the standards governing motions for acquital, the first two themes can be dispatched easily. The third presents substantially the same arguments that this Court has considered and rejected in the past.

In determining whether a motion for a judgment of acquittal should be granted, "[t]he relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Fisher, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). "Under the Jackson v. Virginia standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" Id. (citation omitted). "'Substantial and competent

---

[2] The Government moved to strike the Motion for a New Trial because it did not comply with this Court's Local Rule 7.01, which limits memoranda to 25-pages absent leave of the Court. Subsequently, however, the Court permitted the filing of an oversized brief to which the Government responded, Defendant replied, and the Government sur-replied. Thus, the Motion to Strike (Docket No. 138) will be denied.

5

circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" Id. (quoting United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004)).

**A. Theme One – Unreliable Testimony, Hearsay Documents and Erroneous Jury Instruction**

*1. Unreliable "False and Perjurious Testimony"*

When the evidence is considered in favor of the Government, a rational trier of fact could have found Defendant guilty of bank fraud or aiding and abetting in the same, notwithstanding his assertion that the testimony presented by the Government was rife with perjury, or at least false statements. Credibility determinations are for the jury. United States v. Al-Maliki, 787 F.3d 784, 796 (6th Cir. 2015); United States v. Eaton, 784 F.3d 298, 305 (6th Cir. 2015). Indeed, "[a] defendant's attempt to attack witness credibility 'simpl[y] challenges . . . the quality of the government's evidence and not the sufficiency of the evidence.'" Graham, 622 F.3d at 449 (quoting United States v. Paige, 470 F.3d 603, 608 (6th Cir. 2006)).

It is the "advocate's duty to his client is to argue the credibility of witnesses before the jury deliberates." Graham, 622 F.3d at 449. Defense counsel took full advantage of that opportunity during closing argument by (1) arguing that Little was "a perjurer and a liar" (Docket No. 131, Tr. Trans. Vol. 5 at 197), who "perjured herself over and over again" (id. at 193); (2) asking the jury to "remember how many times" counsel had to "ask witnesses on the stand, 'are you confused?'" (id. at 195); (3) stating that Claudius Oliver committed perjury and was coached into saying (for the very first time on the stand) that Leo Rice told him the money came from Defendant (id. at197-199); (4) telling the jury, "you've seen perjury after perjury" (id. at 211); and (5) claiming that the only truthful witness was Lisa Brooks, who testified that she had never heard of Defendant, even though

6

she had dated and shared a home with Leo Rice for seven years (id. 200-03).

There is more, but the point is that counsel fulfilled his duty by bringing discrepancies to the jury's attention. The jury was properly charged with weighing the evidence and determining which witnesses to believe or not believe, and the jury is presumed to have followed the instructions that they were given. Blueford v. Arkansas,132 S. Ct. 2044, 2051 (2012); United States v. Taylor, 814 F.3d 340, 365 (6th Cir. 2016).

### *2. Hearsay Documents*

Defendant argues that "[a] critical issue in this case [wa]s the AS/400 system," but that, over counsel's objections, "hearsay claims records and files . . . were introduced under the 'business records' exception." (Docket No. 136 at 24). That was error, Defendant insists, because the records were not introduced via a proper custodian or qualified witness.

The business records exception to the hearsay rule provides that "[t]he following [is] not excluded by the rule against hearsay":

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). For a witness "to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." United States v. Coffman, 574 F. App'x. 541, 556 (6th Cir. 2014) (citing United States v. Hathaway, 798 F.2d 902, 906 (6th Cir. 1986)).

7

The contested exhibits in the form of claim files were introduced through Detrick Wells, a Western Express Claims Adjuster. During his testimony, the following exchange occurred between the Government and Mr. Wells:

> Q. Are claims files kept in the course of Western's regular business activities?
>
> A. Yes.
>
> Q. And do accounts payable or A.P., do they create electronic scans of certain claims records?
>
> A. They scan every check request. They scan the check request and the release.
>
> Q. And are these files kept in the regular course of Western Express' business?
>
> A. It's in A.P., so I have no clue, but I'm assuming they keep them.
>
> Q. Is it the regular practice of Western Express to make and keep claims' release forms?
>
> A. Yes.
>
> Q. Is it the regular practice of Western Express to make and keep check request forms?
>
> A. In A.P. from what I understand, yes.

(Docket No. 128, Tr. Trans. Vol. 1 at 89). Based on the foregoing colloquy, Defendant argues that "[i]t is inconceivable that a witness with literally 'no clue' about regular business practices can lay a business records foundation." (Docket No. 136 at 30).

Defendant's argument is set forth in his Motion for a New Trial, which, as noted is incorporated by reference in his Motion for Judgment of Acquittal. Whatever traction his argument is entitled to, it only goes to the former motion because a "sufficiency-of-the-evidence claim . . . is to be assessed on the basis of all the evidence admitted at trial 'whether admitted erroneously or not[.]'" United States v. Zertuche, 565 F. App'x 377, 381 (6th Cir. 2014) (citation omitted). That is,

8

"even wrongly admitted evidence must be taken into account by a court reviewing for sufficiency of the evidence." United States v. Blake-Saldivar, 505 F. App'x 400, 413 (6th Cir. 2012); see United States v. Seymour, 468 F.3d 378, 388 (6th Cir. 2006) ("All of the evidence admitted at trial, including improperly admitted evidence, may be considered in determining whether sufficient evidence supports a guilty verdict."); United States v. Lopez-Medina, 461 F.3d 724, 750 (6th Cir. 2006) ("Although we have concluded that certain evidence in [defendant's] trial was improperly admitted, we nevertheless consider the erroneously admitted evidence as well as the properly admitted evidence in reviewing the sufficiency of the evidence to determine whether [defendant] is entitled to a judgment of acquittal.").

### 3. *Erroneous Instruction*

During closing arguments, counsel repeatedly asserted that the Government was "carrying water" for Western Express, and intimated that Western Express could get its pound of flesh through the civil proceedings. He argued:

> We're not in a civil court. We're not in a civil court and this is not the Western Express vs. Jason Glynn case. It's the United States of America.
>
>        *                 *                 *
> Don't let these people carry water for Western Express because that, unfortunately, is what these nice prosecutors have been doing. They've been carrying water for Western Express. If Western Express wants to put a lien on his house and ruin this man, they can still do it. I asked Mr. Haines[3], "Is the civil case still pending? Yes. We're waiting to see what happens in this case."
>
> They're waiting on you to carry water for Western Express. They're waiting on you to let them take everything this man has using the federal criminal courts. But this is not a civil case. This the United States of America. And we don't convict people and take their freedoms and carry water for private companies unless we can have respect for the amount of proof and -- and the -- the -- the evidence that the government got, the evidence that the government got.

---

[3] Charlie Haines is the Director of Risk Management for Western Express.

131 at 191). After discussing the standard for proof beyond a reasonable doubt, counsel argued:

> Now, we don't require that in civil court. And it's very possible that when Western Express kicks in their civil suit again with their fancy lawyers, that they'll do exactly what Mr. Haines said back in 2011. Remember that e-mail. Remember that e-mail. He didn't say in that e-mail I asked him to look at, "We need to send this case to Federal Court to get justice." He didn't say that. He said, "We need to take Jason's house."
>
> He said, "We need to use the federal system to get restitution."
>
> He said, "Well, that was our lawyers. Our lawyers advised that if we could get the feds to prosecute this case, we would take everything the man had."
>
> That's not what we're here about, folks. They can go get their money. But these aren't their high-priced fancy lawyers. These are United States Attorneys who have a duty to prove cases with integrity, who have a duty to prove cases with proof that we would rely on in the most important decisions of our lives.
>
>      *        *        *
>
> Western Express isn't after justice. They are trying to use our federal justice system in a criminal jury to take everything my client has. Tell them to go do it in civil court. Tell them to go rob him blind in civil court and vindicate their interest down there. And there, they just have to prove it's more likely than not.

(Id. at 208-10). And, as if that were not enough, counsel continued:

> But I besiege you, not even on behalf of my client who is innocent and deserves to go home to his wife and his family. I do besiege you on his behalf. He is about to lose everything he owns to Western Express who has been after him for four years, and there is nothing we can do about that. We can't do anything about the fact that Western Express is about to bankrupt Mr. Glynn. And for those of you who think that maybe Mr. Glynn did something wrong, then take some solace in knowing that they're going to take his house. They've already said that. Charlie Haines said that in an e-mail. They're going to take his house. They're going to tie up his assets in litigation. They said that. They're going to ruin this man. Anybody who thinks my client might be guilty and should be punished, he is going to be ruined, and I won't be there for him.

(Id. at 234).

Counsel's arguments understandably prompted the Government to request a curative

10

instruction and it submitted a proposed instruction to be incorporated in the final jury charge. During the charge conference, defense counsel "vehemently object[ed] to the government's proposed jury instruction" (Docket No. 142, Tr. Trans. Vol. 5 at 2), and now characterizes the instruction that was given as "horribly misleading" (Docket No. 136 at 36). The instruction was as follows:

> Your job in this case is limited to deciding whether the government has proved the crimes charged in the indictment. The potential outcome of any civil lawsuit is not a proper matter for you to consider. Your job is only to decide if the government has proved this defendant guilty of the crimes with which he has been charged.

(Docket No. 142, Tr. Trans. Vol. 5 at 58).

"A trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge 'fails accurately to reflect the law.'" United States v. Geisen, 612 F.3d 471, 485 (6th Cir. 2010) (citation omitted). "'The judge's instructions to the jury as to the law and how the evidence should be assessed are crucial to a fair trial. They should guide the jury's deliberations and are not mere technicalities in our legal system.'" Caldwell v. Bell, 288 F.3d 838, 842 (6th Cir. 2002) (citation omitted). The giving of an improper instruction is reversible error, therefore, "only where the instructions, when viewed as a whole, are found to be confusing, misleading, or prejudicial." United States v. Maslenjak, 821 F.3d 675, 681 (6th Cir. 2016) (citation omitted).

If anything was misleading, horribly or otherwise, it was counsel's argument, not this Court's instruction. Counsel was free to argue Western Express's motives, but the jury's task was not to determine whether Defendant could be bankrupted, lose his house, or be ruined by virtue of the civil suit. Rather its task was to determine whether Defendant committed conspiracy, aggravated identity theft, mail fraud and/or bank fraud as alleged in the Indictment. This Court's instruction simply

11

adapted Sixth Circuit Pattern Instructions 2.01 and 8.08[4] to the facts and arguments presented. See United States v. Douglas, 371 F. App'x 565 (6th Cir. 2010) (citation omitted) ("[W]e have cautioned against the use of 'boilerplate instructions' insufficiently tailored 'to the facts and theories of the specific case being tried.'").

**B. Theme Two – Inconsistent Verdicts**

"'The Supreme Court has repeatedly held that a jury may announce inconsistent verdicts in criminal cases.'" United States v. Lawrence, 555 F.3d 254, 261 (6th Cir. 2009) (quoting United States v. Clemmer, 918 F.2d 570, 573 (6th Cir. 1990)). It did so in Dunn v. United States, 284 U.S. 390 (1932), and reiterated that conclusion in United States v. Powell, 469 U.S. 57 (1984). The rationale for such holdings stems from the fact that "[i]t is unclear whose ox has been gored," Powell, 469 U.S. at 65, inasmuch as "'[a] jury that inconsistently convicts the defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other,'" Lawrence, 555 F.3d at 261-62 (quoting United States v. Johnson, 223 F.3d 665, 675 (7th Cir. 2000)).

In light of Dunn and Powell, the Sixth Circuit has "repeatedly recognized that inconsistent verdicts in a criminal case generally are not reviewable." United States v. Randolph, 794 F.3d 602

---

[4] So far as relevant, Pattern Instruction 2.01 reads:

"I want to emphasize that the defendant is only on trial for the particular crime charge in the indictment (and the lesser charges that I explain to you). Your job is limited to deciding whether the government has proved the crime charged (or one of those lesser charges)."

6th Cir. Pattern Crim. Jury Inst. § 2.01. Similarly, Pattern Instruction 8.08 provides in part:

Remember that the defendant is only on trial for the particular crime charged in the indictment [and the lesser charges that I have described]. Your job is limited to deciding whether the government has proved the crime charged [or one of those lesser charges].

Id. § 8.08.

610 (6th Cir. 2015) (citing United States v. Smith, 749 F.3d 465, 498 (6th Cir. 2014)). This rule, however, is subject to two exceptions:

> First, where jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality," we have opined that "relief may be warranted." . . . Second, in a situation "where a guilty verdict on one count necessarily excludes a finding of guilt on another," i.e. a "mutually exclusive" verdict, this court can review the defendant's challenge to the verdict.

Id. at 610-11 (internal citations omitted).[5]

Here, Defendant "submits that both rationales apply," because "[t]here is no way that Mr. Glynn could have logically committed the offenses listed in four (4) through eight (8) without committing the alleged acts in the earlier, referenced paragraphs, for which the jury explicitly found him to be not guilty." (Docket No. 137 at 14). Of course he could have.

"A jury's verdict is not accompanied by a narrative of its reasoning, and the jurors in [this] case could have acquitted him of [Counts One through Three] for any number of reasons," United States v. Stetler, 5126 F. App'x 631, 634-45 (6th Cir. 2013), not the least of which is that the counts on which Defendant was acquitted contain elements that differ from the element for the counts on which he was convicted. The jury could have concluded, based on the evidence, that Defendant did not enter an agreement with Rice and Little to use a scheme involving the mail, that he did not use (or cause the use of) the mails in furtherance of a scheme to defraud, and that he did not use the

---

[5] The Sixth Circuit has observed that the "mutually exclusive" exception "contemplate[s] a situation in which a defendant receives two guilty verdicts that are logically inconsistent, for example if a jury convicted a defendant of both larceny and embezzlement based on the same underlying conduct." United States v. Ruiz, 386 F. App'x 530, 533 (6th Cir. 2010). Some courts have "interpreted [this] exception to narrowly apply to only 'those situations where a jury has convicted a defendant of two crimes and those convictions are mutually exclusive' or, put differently, where the defendant was 'convicted of two crimes, at least one of which he could not have committed.'" United States v. Maury, 695 F.3d 227, 265 (3rd Cir. 2012) (citation omitted). Of course, an "obvious distinction," Ruiz, 386 F. App'x at 533, occurs where, as here, the Defendant was convicted on some counts but acquitted on others.

13

identification of another on the date specified in the Indictment, but that he did (by himself or with others) execute a scheme to obtain money in the control of a financial institution. See, Stetler, 526 F. App'x at 635 (stating that where "crimes alleged in each count require proof of entirely different elements . . . acquittal of one does not necessarily render conviction of the other inconsistent"); United States v. Hudson, 49 Fed. App'x 79, 80 (7th Cir. 2002) (stating that "inconsistent verdicts are permissible in criminal cases" but that where "two offenses have different elements" contrasting verdicts are not inconsistent); United States v. Latimer, 780 F.2d 868, 871 (10th Cir. 1985) (holding that different verdicts on crimes that "involve proof of different elements" are "not necessarily inconsistent" and that "[i]n all events . . . each count of an indictment constitutes a separate offense, and consistency in the verdict is not required"). Or, it could be that the jury decided to acquit on some counts "out of compassion or compromise or because 'their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'" Standefer v. United States, 447 U.S. 10, 22 (1980) (quoting Dunn, 284 U.S. at 393).

**C. Theme Three – Legal Insufficiency Based on Precedent**

Defendant argues that,

> As set forth in the defense pre-trial motion, and as is still true today, the Court has not heard any evidence that Mr. Glynn forged anyone's signature to any check presented to a bank. The prosecutors presented no proof whatsoever that Mr. Glynn forged the name of Jared Sykes, or any of the other individuals to whom checks were issued by Western Express in the five (5) counts of conviction. Nor did the prosecutors present any proof that Mr. Glynn defrauded a teller, or stole a check from Western Express. To the contrary, the Court heard proof that all of the checks at issue in these five (5) counts were valid checks that were actually approved by Western Express supervisors. There is simply no evidence that Mr. Glynn defrauded a <u>bank</u>, or sought to take money from a *bank* via fraud.
>
> To the contrary, he presented valid checks approved by supervisors at Western Express to his own bank, and endorsed the checks in his own name. Every single prosecution witness confirmed that Mr. Glynn had no power, authority, or

14

ability to issue checks himself from Western Express or to create fake checks. Checks had to be approved by Clarence Easterday,[6] Charlie Haines, or other management at Western Express, causing the company to issue valid checks. . . .

(Docket No. 137 at 7-8, emphasis in original). Continuing to rely "on a similar case, United States v. Rodriguez, 140 F.3d 163, 165 (2nd Cir. 1998), Defendant argues, this "remains a simple, garden variety fraud committed against Western Express, and the evidence "fails to support a conviction for bank fraud, even after the Supreme Court holding in Loughrin v. United States, 134 S. Ct. 2384 (2014)." (Id. at 8 & 10).

These arguments are virtually the same that this Court considered previously and it is unnecessary to reinvent the wheel in rejecting them once again. In denying Defendant's Motion to Dismiss, the Court wrote:

> Contrary to Defendant's assertion, Rodriguez was not based on a "strikingly similar set of facts." (Docket No. 66 at 4). Rodriguez involved a situation where defendant fraudulently received checks from a company, endorsed those checks, and placed them into her own account. "There [wa]s no evidence that [defendant] engaged in a deceptive course of conduct as to the bank," and "[a] course of conduct consisting of simply depositing checks into a bank account where the depositor knows that he/she is not entitled to the funds does not alone constitute false of fraudulent pretenses." Rodriguez, 140 F.3d at 168.
>
> Here, the allegation is not just that Defendant hoodwinked Western Express into cutting him a check, which he then placed into his own bank account. Rather, the allegation is that he presented the check to the bank with a forged signature. Not only that, the Government has indicated that it expects to prove at trial that "the names and addresses listed in the 'payee' section of these checks were fabricated . . . out of thin air." (Docket No. 50 at 2-3). Thus, even if, as Defendant argues, Rodriguez should be read as standing for the proposition that "[w]here a defendant obtains a valid check by means of fraud, it may indeed be a fraud against the issuer of the check, but is not 'bank fraud' because the bank employee is simply depositing a 'bearer instrument' negotiable by the party who possesses the check,' (id.), his reliance on that case is misplaced.
>
> Defendant's reliance on Loughrin v. United States . . ., which involved a scheme to

---

[6] Clarence Easterday is the Executive Vice President of Western Express.

15

present altered and forged checks to Target stores, is also misplaced. If anything, that decision supports the conclusion that the bank fraud charges in this case are appropriate.

Defendant relies on Loughrin's citation to Rodriguez for the statement that "[o]ne might think the Federal Government would never use the bank fraud statute to prosecute . . . ordinary frauds just because they happen to involve payment by check rather than cash." Id. at 2392 n. 5. However, the sole question presented was "whether the Government must prove that a defendant charged with violating [18 U.S.C. § 1344(2) ] intended to defraud a bank, id. at 2387, and the Court found that it need not. Even so, the Supreme Court considered whether presenting a forged check was within the bank fraud statute and found that it was, writing:

> Section 1344(2)'s "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control. That occurs, most clearly, when a defendant makes a misrepresentation to the bank itself-say, when he attempts to cash, at the teller's window, a forged or altered check. In that event, the defendant seeks to obtain bank property by means of presenting the forgery directly to a bank employee. But no less is the counterfeit check the "means" of obtaining bank funds when a defendant like Loughrin offers it as payment to a third party like Target. After all, a merchant accepts a check only to pass it along to a bank for payment; and upon receipt from the merchant, that check triggers the disbursement of bank funds just as if presented by the fraudster himself. So in either case, the forged or altered check- *i.e.*, the false statement-serves in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property.

Id. at 2393 (footnote omitted).

United States v. Glynn, 2015 WL 2125082, at *7-8 (M.D. Tenn. May 6, 2015). The Court concluded its discussion by observing that "the means by which Defendant obtained money from his bank was through the use of a forged payee's name, or so a reasonable jury could find." Id. at 8. That conclusion remains to this day.

When the evidence is viewed in the light most favorable to the prosecution, a jury could conclude that the five checks contained forged or fraudulent and that Defendant was the one who

16

endorsed them. Defendant was the employee who processed the five claims, and those claims contained irregularities and inaccuracies. All of the checks ended up in his bank account, with his endorsement, but were payable to claimants who did not reside at the addresses on file with Western Express – four were nonexistent addresses, and the fifth was a PO Box whose holder had never heard of the supposed claimaint. None of the supposed claimaints could be located by Western Express.

True, this is circumstantial evidence, but "the law generally makes no distinction between direct and circumstantial evidence." United States v. Clay, 667 F.3d 689, 702 (6th Cir. 2012) (citation omitted). Further, and "although the government is not permitted to build a conviction on a house of cards, neither is a jury required to leave its common sense at the courthouse door." United States v. Anderson, 747 F.3d 51, 70 (2d Cir. 2014). "Jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences," id., and it is their job to "draw reasonable inferences from basic facts to ultimate questions," United States v. Soto, 794 F.3d 635, 660 (6th Cir. 2015).

Here, when the facts are construed in favor of the Government, the jury could have drawn the conclusion that the endorsement signatures of Garver, Keller, Anderson, Ganken, and Sikes were not theirs (assuming they exist), and that Defendant is the one who fraudulently signed on their behalf so as to receive moneys from a bank. The jury was free to draw the conclusions that (1) one seeking close to $10,000 for vehicle damage would provide an actual address; (2) such an individual would likely want the cash instead of an alleged luxury wristwatch[7] or, at the very least, it is

---

[7] Defendant did not take the stand at trial. During opening arguments, however, counsel argued that Plaintiff was in the business of collecting and selling luxury watches, and suggested that watches were sold to the supposed claimants identified in the bank fraud counts.

17

extremely unlikely that all five unrelated claimants chose a watch over money; and (3) claimants would not drive considerable distances (some across country) to endorse a check to Defendant to secure a prized watch.

Contrary to the hypothetical in Loughrin, the banks involvement was not simply fortuitous. A jury could have concluded that Defendant submitted fraudulent claims to Western Express for the specific purpose and with the specific expectation of getting checks drawn on Western Express's account, and was able to deposit those checks because the signatures of the payees were forged. In the words of Loughrin, he satisfied the "'by means of' language" by "mak[ing] a misrepresentation to the bank itself" by depositing "a forged or altered check," 134 S. Ct. at 2393, or so the jury apparently found. See, United States v. Warshak, 631 F.3d 266, 313 (6th Cir. 2010) ("In the Sixth Circuit, a defendant may be convicted of bank fraud if he intends to defraud someone and implements a fraudulent scheme that either causes a federally insured financial institution to transfer funds or exposes that institution to some degree of risk.").

The Court has no hesitation in concluding that *a* reasonable jury could have convicted him on the evidence presented. It does not automatically follow, however, that his request for a new trial should also be denied.

## II. Motion for New Trial

"A motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence." United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007). "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" Id. at 592-93.

"In deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district judge 'may sit as a thirteenth juror' and consider the evidence to ensure that there is no miscarriage of justice.'" United States v. Monoz, 605 F.3d 359, 373 n.9 (6th Cir. 2010) (citation omitted). In this regard, the judge may assess the credibility of witnesses and the weight of the evidence. United States v. Perales, 2013 WL 4529509 at *2 (6th Cir. Aug. 27, 2013). Still, and while "[t]he decision of whether to grant a new trial is committed to the 'sound discretion of the trial judge, . . . this discretion should be exercised 'only in extraordinary circumstance[s].'" United States v. Canal Barge Co., 631 F.3d 347, 357 (6th Cir. 2011) (citation omitted).

Defendant's Motion for a New Trial has been the subject of considerable briefing. Even so, the Court finds it appropriate to hear oral arguments from the parties.

The Court's concern is not with an alleged inappropriate instruction, or the introduction of supposed hearsay documents. Rather, the Court's concern is with the nature and quantum of proof that was introduced (or not introduced) relative to the counts of conviction.

Defendant has raised numerous allegations of inconsistent statements by the witnesses, and even perjurious testimony.[8] While the Government has discounted each of the statements as being not indisputably false, actually disclosed, discovered after trial, and/or immaterial to the counts of conviction, the Court is not so sure that a new trial is not warranted, given the cumulative effect of the statements. Additionally, the Court is concerned that Defendant was convicted because he *must*

---

[8] At trial, the Government presented evidence suggesting that Little and Defendant would process the fraudulent clams through fake companies, including J&J Services, and A&J Logistics. Little used a charge card linked to J&J Services, and testified that she had no knowledge of a charge on the card for the Thrifty Inn, implying that Glynn was the one who used the card. That was untrue and was only corrected after the Government took it upon itself to investigate the matter after Little had finished testifying. After trial, the Government filed a Notice, admitting that, through an oversight, it failed to apprise Defendant that Little had been fired from her job in late 2014 because she falsified time/payroll records.

*have* been the one to have signed the checks (or enlisted someone to do it), yet in a case alleging bank fraud, no government agents were called to say what they may done to track down the supposed claimants, or whether any effort was made to determine whether the handwriting might have been Defendant's. Additionally, while the AS/400 system was said to be very important in the processing of claims, the evidence was all over the place as to whether the system could be manipulated, intentionally or not.[9]

Finally, the Court notes that Defendant has suggested the Government was aware of some of the false statements and/or that one or more witnesses was coached, and requests an evidentiary hearing to determine whether the Government engaged in misconduct. At this point, the Court gives no credence to Defendant's allegations, but will also hear arguments on Defendant's contention that an evidentiary hearing is appropriate.

### III. Conclusion

On the basis of the forgoing, Defendant's Motion for Judgment of Acquittal will be denied. The Court will hear oral arguments on his Motion for a New Trial. Of course, between now and the time of that argument, the parties are free to explore the possibility of resolving this case before the hearing and the prospect of yet another trial.

An appropriate Order will enter.

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[9] The Government's assertion that some of the problems with the proof raised by Defendant have no relation to the counts of conviction may be overly simplistic given that the alleged co-conspirators – Rice and Little – were key witnesses, yet Defendant was acquitted on the conspiracy count. While that acquittal does not entitle Defendant to acquittal on the bank fraud counts, it does not necessarily follow that he is not entitled to a new trial.