# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 3:13-00059 |
| | ) | Judge Sharp |
| JASON GLYNN | ) | |

## MEMORANDUM

In a case that has already been tried once, with a retrial scheduled to begin next week and a final pretrial conference set for tomorrow, the parties should be well on the way towards final preparation. A number of recent filings, however, suggest otherwise, and some posturing as well.

It began with the Government's February 16, 2017 Motion to Ascertain Status (Docket No. 164), which was promptly disposed of the next day because the Court had granted Defendant's request for a new trial at the conclusion of a hearing held on December 13, 2016. This was followed on February 24, 2017 by a Motion to Strike Surplusage in the Indictment, through which the Government sought to eliminate language from the Counts on which Defendant was acquitted, but which also stated that the Government "would be willing to consent to a short adjournment of the trial date if the defendant requests one for scheduling purposes." (Docket No. 166 at 6). Then, on February 28, 2017 – just a week before trial – Defendant filed a "Response in Opposition to the Government Motion to Strike Surplusage in the Indictment," so that this case "can proceed to trial as scheduled," (Docket No. 177 at 1), yet, at the same time, he filed two separate Motions to Dismiss (Docket Nos. 178 & 179), the granting of either of which would result in no trial at all.

## I.

Defendant was indicted by a federal grand jury on eight counts: Count One charged him

1

with conspiracy to commit mail fraud; Count Two charged him with mail fraud; Count Three charged him with aggravated identity theft; and Counts Four through Eight charged him with bank fraud. The jury returned a verdict on December 14, 2015, acquitting him of the charges contained in the first three counts, but convicting him on the remaining counts. On August 22, 2016, the Court entered an Order (Docket No. 158) and an accompanying Memorandum (Docket No. 157) denying Defendant's Motion for Judgment of Acquittal (Docket No. 137) and deferring ruling on his Motion for New Trial (Docket No. 136) pending a hearing. At the conclusion of the December 13, 2016 hearing, the Court granted Defendant's request for a new trial on Counts Four through Eight, and set the matter for trial on March 7, 2017.

**II.**

The Government did not appeal this Court's ruling, nor did it seek a Superceding Indictment that would have eliminated the acquitted counts. Instead, it filed the Motion to Strike Surplusage.

In its Motion, the Government moves to strike "the language of Count One, Count Two, and Count Three; the first paragraph of Counts Four through Eight; and paragraphs 2-4 of the section labeled Forfeiture Allegations." (Docket No. 166 at 1). Even though the Government claims that "it would be permissible to retry the case without altering the indictment at all, and simply including a jury instruction telling the jury to ignore the language in Counts One, Two, and Three," it asserts that "[s]triking this language from the indictment would not create an impermissible variance or otherwise contravene [Defendant's] rights." (Id. at 2 & 4). As for how this can best be accomplished, the Government submits

> that the Court has discretion to determine how to implement the change logistically. That is, the Court could choose (after hearing from the defendant) to: (1) redact the language associated with the counts of acquittal and send a redacted version back to the jury room; (2) send to the jury room a "clean" version of the indictment (which

2

the government could provide) containing only the language associated with the counts of conviction; or (3) read the non-stricken language to the jury, while declining to send a copy of the indictment back to the jury room.

(Id. at 5).

Although Defendant appears to oppose the Government's proposal in its entirety, this is not certain. He writes:

> To be clear, the defense does not oppose the government motion "to strike surplusage" in the sense that the Defendant seeks to proceed to trial on the indictment in its current form. Nor does Defendant oppose the motion, at this time, in the sense that the defense seeks to continue the trial so the government can do what it should have done months ago, to wit, seek a superseding indictment. Rather, the defense opposes the government motion in the sense that what the government seeks is a literal, pre-trial amendment to the indictment returned by a grand jury, which is unlawful and unconstitutional.

(Docket No. 171 at 1).

The Government's request is unlawful, Defendant claims, because the Government did not do what it should have done long ago – seek a Superseding Indictment. Instead, it now seems to be attempting to utilize a Rule, *viz* Fed. R. Crim. P. 7 (d), which allows only a defendant to request the striking of surplus from an Indictment, and it seemingly invites the Court to misapply another Rule, *viz* Fed. R. 7(c), which allows a court only to it amend an information. In short, Defendant argues that "[o]nce an indictment is filed, the Rule provides no mechanism for the prosecution or court to tamper with the indictment." (Id. at 3).

The Government's request is unconstitutional, Defendant claims, because "'[t]he Fifth Amendment guarantees that an accused be tried only on those offenses presented in an indictment and returned by a grand jury,'" yet, through its Motion to Strike, the Government seeks a "literal amendment to the terms of the indictment[,] which is . . . 'considered per se prejudicial and warrants reversal of a conviction.'" (Id. at 5) (citation omitted). Defendant contends that "[t]he timely filing

3

of a superseding indictment," on the other hand "would have ensured 'fair notice of the charges', would have allowed fair litigation of double jeopardy issues (both as to issues at the retrial and for any future prosecutions), and would have allowed the Defendant to be tried only upon charges returned by a grand jury independent of the courts and prosecution." (Id. at 9).

Counsel for Defendant argues that he "has diligently sought a case in which the Supreme Court or Sixth Circuit approved of such a literal pre-trial amendment to an indictment after an acquittal on some counts, with a new trial ordered on others, but has been unable to find a case exactly on point." (Docket No. 170 at 5). Maybe so, but "[n]umerous decisions have specifically recognized the power of the district court to redact from an indictment charges which the government has resolved not to prosecute, . . . and superfluous language which unfairly prejudices the accused." United States v. Vastola, 899 F.2d 211, 231 (3rd Cir.) (judgment vacated on other grounds, 497 U.S. 1001 (1990)) (collecting cases). Indeed, while an indictment "may not . . . be so severely redacted that any of the elements of the offense are expunged," redaction "is permissible so long as the elements of the offense charged are fully and clearly set out in what remains." United States v. Doherty, 867 F.2d 47, 55 (1st Cir.1989) (collecting cases); see also United States v. Cruz, 508 F. App'x 890, 897 (11th Cir. 2013) (citation omitted) (stating that a "court may redact an indictment 'so long as the elements of the offense charged are fully and clearly set out in what remains'" ).

Redaction need not be limited to just a couple of words or a phrase, such as the elimination of the nature of a prior conviction pursuant to Old Chief v. United States, 519 U.S. 172, 190 (1997). For example, in United States v. Miller, 471 U.S. 130 (1985) defendant was charged with three counts of mail fraud, but the government moved to dismiss the third count and the remaining two

4

were tried to the jury. Upon conviction, defendant appealed to the Ninth Circuit, which found a fatal variance between the crimes charged and the counts of conviction. The Supreme Court reversed and, in doing so, observed:

> The Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways. As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime. . . . Indeed, a number of longstanding doctrines of criminal procedure are premised on the notion that each offense whose elements are fully set out in an indictment can independently sustain a conviction. . . .
>
> A review of prior cases allowing convictions to stand in the face of variances between the indictment and proof makes the Court of Appeals' error clear. Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored."

Id. at 136.

It is true that Miller's concern was with a variance, and the Sixth Circuit "has recognized both the distinction between variances and amendments and the reasons underlying their treatment." United States v. Zelinka, 862 F.2d 92, 97 (6th Cir. 1988). With regard to the latter, that court has observed:

> The purposes underlying the rule against amendments and constructive amendments include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further prosecution for the same offense and finally, of "paramount importance," the assurance that a group of citizens independent of prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for a determination of the defendant's guilt or innocence.

Id. None of those concerns, however, are impacted by the Government's present proposal to strike the language relating to the acquitted counts.

5

As revised, the Indictment would read:

THE GRAND JURY CHARGES:

COUNTS FOUR THROUGH EIGHT

2. Pinnacle Bank is Federal Deposit Insurance Corporation ("FDIC") insured and maintained funds in its custody and control on behalf of Western Express.

3. Beginning in or around November 2009 and continuing until in or around July 2010, in the Middle District of Tennessee and elsewhere, the defendant, JASON GLYNN, knowingly and with the intent to defraud, executed and attempted to execute a scheme and artifice to defraud Western Express and to obtain the monies, funds and other property under the custody and control of Pinnacle Bank, by means of material false and fraudulent pretenses, representations, and promises.

4. It was part of the scheme that JASON GLYNN submitted falsified paperwork to Western Express concerning false accident claims purportedly arising from automobile accidents that either never occurred or that had occurred but did not involve the named claimants.

5. It was part of the scheme that JASON GLYNN caused Western Express to issue checks, payable on its Pinnacle Bank account, in the names of the individuals listed on the falsified paperwork.

6. It was further part of the scheme that JASON GLYNN took possession of the checks issued by Western Express and fraudulently endorsed the checks by signing his own name and forging the signature of the individuals whose names appeared on the checks.

7. It was further part of the scheme that JASON GLYNN deposited the fraudulently-endorsed checks into a SunTrust Bank account in his name and under his control, and caused funds in the custody and control of Pinnacle Bank to be transferred to that account.

8. On or about the dates set forth below, in the Middle District of Tennessee and elsewhere, defendant JASON GLYNN executed and attempted to execute the scheme and artifice as set forth above, in that the defendant deposited the following checks, each being a separate count of this Indictment, into a SunTrust Bank account in his name and under his control:

| Count | Date | Check Number | Amount |
| --- | --- | --- | --- |
| 4 | 12/28/09 | 201647 | $9,350.73 |

| 5 | 4/5/2010 | 205287 | $9,438.84 |
| 6 | 2/24/2010 | 205254 | $9,861.23 |
| 7 | 6/14/2010 | 212476 | $9,760.08 |
| 8 | 7/6/2010 | 212482 | $9,723.00 |

All in violation of Title 18, United States Code, Sections 1344 and 2.

(Docket No. 3 at 9-10).

Certainly, and leaving aside that Defendant has already seen a preview (if not a full dress rehearsal) of the Government's case, those allegations provide more than sufficient notice of the charges he will face. They are also more than sufficient for the Court to determine whether the facts marshaled at trial are sufficient for conviction, and whether further prosecution would be barred. And, while Defendant contends "[t]here is a non-trivial chance that no grand jury would ever indict [him] for five counts of bank fraud that occurred seven (7) years ago based on the minimal proof presented as to these counts at trial, and without the taint of mail fraud allegations that the first grand jury explicitly included in the bank fraud counts," (Docket No. 171 at 9-10), the fact remains that he was indicted by a grand jury on these very charges. See Miller, 471 U.S. at 132 (Supreme Court explicitly rejected Ninth Circuit's rationale for vacating convictions based on the fact that (1) "grand jury may well have declined to indict [defendant] simply on the basis of his exaggeration of the amount of his claimed loss" and (2) it was "quite possible that the grand jury would have been unwilling or unable to return an indictment based solely on [defendant's] exaggeration of the amount of his claimed loss even though it had concluded that an indictment could be returned based on the overall scheme involving a use of the mail caused by [defendant's] knowing consent to the burglary").

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. "Ever since Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849, was decided in 1887, it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215-16 (1960). "An indictment is broadened 'when the government, the court, or both, broadens the possible bases for conviction beyond those presented by the grand jury.'" United States v. Watford, 468 F.3d 891, 908-9 (6th Cir. 2006) (quoting, United States v. Duran, 407 F.3d 828, 842 (7th Cir.2005)). The Government's proposal to eliminate the language of the counts on which Defendant was acquitted does no such thing.

### III.

In his Motion to Dismiss for Violation of the Double Jeopardy Clause, Defendant argues that "the government's very late filing in this case, and failure to timely seek a superseding indictment, has made it difficult to know what proof the government intends to present, what allegations it believes are fairly included in a retrial of the bank fraud counts, and what disputes may exist under issue-preclusion analysis." (Docket No. 170 at 7). But, "[t]here is no general constitutional right to discovery in a criminal case," United States v. Vujovic, 635 F. App'x 265, 268 (6th Cir. 2015) (citing, Weatherford v. Bursey, 429 U.S. 545, 559 (1977)); rather, "Rule 16 is the primary means of discovery in criminal cases," United States v. Llanez-Garcia, 735 F.3d 483, 493 (6th Cir. 2013), and Defendant does not claim such a violation. And, while Defendant repeatedly takes the Government to task for failing to follow the normal course and seek a superseding indictment, he has not shown that securing a new indictment is an absolute requirement. See United States v. Brown, 571 F.3d 592, 499 (5th Cir.

8

2009) (concluding that "there is no issue of double jeopardy or collateral estoppel that impair[ed] a retrial" when, "[u]pon remand, the Government moved to redact the indictment to remove all references to the honest services theory of fraud" and where "[t]he redacted version of the indictment [wa]s otherwise identical to the indictment on which the defendants were convicted at the first trial").

As for issue preclusion, Defendant argues "that there are obviously important issues that were fairly decided by the previous jury, and which are thus barred at the next trial." (Docket No. 170 at 7). He provides the following examples:

> First, the Indictment includes a "Background" section, with references to "LR" and "JL", two alleged co-conspirators in the acquitted counts. In the Indictment, and at trial, the government presented the bank fraud and mail fraud as part of the same scheme, alleging facts in each type of alleged offense in the others. The defense avers that any allegations involving a scheme to defraud with alleged co-conspirators "LR" and "JL", Leo Rice and Jamie Little, were fairly decided by the last jury, and that testimony involving the schemes of these individuals must be precluded.
>
> A second example is clear in Count One, which alleges "conspiracy to commit mail fraud", and explicitly includes the bank fraud counts as part of that conspiracy at paragraph 6(f), alleging: "… part of this conspiracy and the manner and means by which the conspiracy was sought to be accomplished by Jason Glynn, LR, JL, and others …" was "[t]o forge endorsement signatures on checks issued by Western Express payable to certain individuals, real or imaginary, and to deposit these checks into the personal bank account of Jason Glynn". . . . Indictment, Docket No. 3, p. 2-3. These allegations were included as part of Count One, for which a jury acquitted Mr. Glynn. Due to the verdict of "not guilty", "issue-preclusion" prevents the government from presenting evidence that Mr. Glynn "forged endorsement signatures" on checks or deposited them to his bank. The defense thus objects to any such evidence or argument at the retrial, as that issue has already been fairly decided by a jury.
>
> Third, Count Two alleges "mail fraud" and avers that Mr. Glynn "devised and intended to devise a scheme and artifice to defraud" and that "[i]t was further part of the scheme that Jason Glynn and others deposited checks issued by Western Express into accounts they controlled". . . . There was no testimony at trial about Mr. Glynn depositing money in to any bank account "under his control", aside from his own account, which also directly involves the five (5) counts of bank fraud, even with the

9

> amendments to the indictment now proposed by the government. Therefore, because the government included this factual allegation in Count Two, a count for which Mr. Glynn was acquitted, the defense again objects to proof about deposits in to bank accounts "controlled" by Mr. Glynn, under issue-preclusion.

(Id. at 7-8).

"In addition to barring retrial of a charge upon which a defendant was acquitted, . . . 'the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial.'" United States v. Coughlin, 610 F.3d 89, 96 (D.C. Cir. 2010) (quoting, Yeager v. United States, 557 U.S. 110, 118 (2009)). "'To decipher what a jury has necessarily decided,' Yeager reaffirmed, courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" Id. This examination of " issue preclusion . . . must be applied with 'realism and rationality.'" Bravo-Fernandez v. United States, 137 S. Ct. 352, 359 (2016) (quoting, Ashe v. Swenson, 397 U.S. 436, 444 (1970)). "[I]f multiple potential reasons for acquittal are evident in the record of the trial, [a court] will not presume that the jury acquitted on the ground most favorable to the defendant. The question is what the jury 'necessarily' decided." Coughlin, 610 F.3d at 97.

This Court previously undertook the task of trying to determine what the jury necessarily decided in the context of Defendant's Motion for Judgment of Acquittal where he claimed that the jury returned irreconcilable and inconsistent verdicts. After Defendant argued "[t]here is no way that [he] could have logically committed the offenses listed in four (4) through eight (8) without committing the alleged acts in the earlier, referenced paragraphs, for which the jury explicitly found him to be not guilty," (Docket No. 137 at 14), the Court wrote:

10

Of course he could have.

> "A jury's verdict is not accompanied by a narrative of its reasoning, and the jurors in [this] case could have acquitted him of [Counts One through Three] for any number of reasons,". . . not the least of which is that the counts on which Defendant was acquitted contain elements that differ from the element for the counts on which he was convicted. The jury could have concluded, based on the evidence, that Defendant did not enter an agreement with Rice and Little to use a scheme involving the mail, that he did not use (or cause the use of) the mails in furtherance of a scheme to defraud, and that he did not use the identification of another on the date specified in the Indictment, but that he did (by himself or with others) execute a scheme to obtain money in the control of a financial institution. . . . Or, it could be that the jury decided to acquit on some counts "out of compassion or compromise or because 'their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'"

United States v. Glynn, 2016 WL 4430696, at *7 (M.D. Tenn. Aug. 22, 2016) (internal citations omitted).

The same reasoning applies with regard to Defendant's present claims regarding issue preclusion. Moreover, the specific allegations about which he complains, *e.g.*, the forging of endorsement signatures on checks and the depositing those checks in his bank account or in accounts he controlled, are allegations that were also contained in the counts on which Defendant was convicted. Thus, it cannot be said that, by rendering an acquittal on the first three counts, the jury absolved him of such conduct.

## IV.

As if attempting to prove the adage that no good deed goes unpunished, Defendant filed a Motion to Dismiss for Violation of Defendant's Speedy Trial Rights. (Docket No. 169). That Motion is brought under both the Speedy Trial Act and the Sixth Amendment.

### A.

The Speedy Trial Act provides that "[i]f the defendant is to be tried again following a

11

declaration by the trial judge of a mistrial or following an order of such judge for a new trial, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). By defense counsel's calculations, that 70-day period began when the Court orally granted his request for a new trial and expired no later than February 20, 2017.

In moving to dismiss, Defendant squarely places the blame entirely on the Government for failing to act diligently. He claims that "[a]t the hearing on the Motion for New Trial, the Court initially considered a trial date in early 2017, but the government averred it required time to appeal the Court's decision, leading the Court to set a later trial date of March 7th, 2017." (Docket No. 169 at 1-2). He also argues:

> The government's actions – and inactions – are significant, because the government bears responsibility for ensuring that a defendant is tried within the deadline. . . .
>
> The government has certainly not been diligent in the instant case in ensuring that Mr. Glynn was 'tried within the deadline', as it asked the Court to set a later trial date so as to explore an appeal, as it failed to move to continue in the interests of justice prior to the clock running, and as it failed to appeal or take other action to stop the clock from running. By asking the Court to set the trial date on a later date, and by failing to appeal, the government quite simply allowed the clock to run out.

(Id. at 3-4, citations and footnotes omitted). Counsel for Defendant also states that while he "does not have a transcript of the December 13th, 2017 hearing, he "has no recollection of an [ends] of justice finding[] on the record orally," and submits that, to the extent any such findings may have been made, "there were insufficient findings to warrant a trial commencing past the seventy (70) day window . . . particularly given that the government sought a later trial date." (Id. at 5-6, emphasis in original).

Apparently, counsel has no recollection as to how the trial date of March 7 came to be set either. After the Court granted the Motion for New Trial, the following exchanges between the

12

Court and counsel for the parties took place:

> THE COURT: . . . So Mr. Steed everybody's tried this case once, although now Mr. VanDevender is on his own and probably will have to pick up somebody else to help him. 60 days? Can everybody be ready?
>
> MR. STEED: Your Honor, I'm checking my calendar now.
>
> THE COURT: I didn't think you were making a phone call.
>
> MR. STEED: These phones have made it hard to look at calendars.
>
> THE COURT: Right. I know.
>
> MR. VANDEVENDER: You Honor, we might suggest that it be scheduled a little bit further off, maybe 90 days, to give us time to discuss whether to appeal the order and get everyone else up to speed.
>
> THE COURT: Well, let's set it, and if you appeal it then that will take care of –
>
> MR. VANDEVENDER: That's fine.
>
> THE COURT: That solves its own problem.
>
> MR. STEED: Your Honor, I will say that 09 [sic] days, that would be helpful to me. My March is very open now and that suggestion would be welcome but I know Your Honor's calendar is not open any time, so –
>
> THE COURT: No, none of them are good and they're getting worse. All right. Let's set it for March 7th, all right? I'll get an order setting it out for that date and giving you all of your deadlines.
>
> MR. STEED: Thank you, Your Honor
>
> THE COURT: All right.

(Rough Transcript of 12/13/16 Hearing at 11:35:11- 11:37:04).

Maybe counsel was being clever by a half in agreeing to a trial date outside the 70-day window, but the Court hopes that not to be the case. The Court also hopes that counsel truly does not remember how the March 7 trial date was selected. It was not selected simply because the

13

Government wanted that date. Instead, it was selected only after the Court proposed a trial date within the Speedy Trial Act limitations and defense counsel stated that a March trial date would be better for him and his calendar.

The Supreme Court has observed that "[s]cheduling matters are plainly among those for which agreement by counsel generally controls [because] only counsel is in a position to assess the benefit or detriment of the delay to the defendant's case" in deciding whether to agree "to a specified delay in trial." N.Y. v. Hill, 528 U.S. 110, 115 (2000). While the Court made that observation in the context of a claim under the Interstate Agreement on Detainers Act, "[s]everal courts have applied this principle in the STA context. See, e.g., United States v. Bryant, 134 F.3d 364 (4th Cir.1998) (unpublished table decision) (stating, in STA context, that the district judge was entitled to conclude that the defendant's counsel spoke for him); United States v. Fields, 39 F.3d 439, 443 (3rd Cir.1994) (finding fault with defendant's argument that 'he would have us order the dismissal of his indictment based on continuances that his own attorney sought'); United States v. Troy, 564 F. Supp.2d 42, 47 (D. Me.2008) (noting, in STA context, that '[t]he adversary process could not function effectively if every tactical decision required client approval')." United States v. Gates, 709 F.3d 58, 65-66 (1st Cir. 2013).

Moreover, Section 3161(h)(7)(A) of the Speedy Trial Act authorizes a court to grant a continuance at the request of a defendant and/or his counsel. "[T]his statutory provision says what it means and means what it says. So read, the thrust of the provision comports with the well-settled principle that express consent by counsel is controlling with respect to scheduling and trial management matters without any requirement that the defendant personally acquiesce." Id. at 65. The fact that the continuance was not designated as such, but rather took the form of setting the trial

14

date in a case-management order, is . . . not fatal." United States v. Stone, 461 F. App'x 461, 466 (6th Cir. 2012). Moreover, "[a]n ends-of-justice continuance can be found even when a delay is not designated as such by the court." Id. "And where an attorney seeks a continuance without the client's approval, [the Sixth Circuit] has held that the Speedy Trial Act 'does not require a defendant's consent to the continuance' in order for a judge to be able to grant a motion in furtherance of the ends of justice." United States v. Stewart, 628 F.3d 246, 254 (6th Cir. 2010).

Defendant is correct that the Court did not set forth the reasons for finding that the ends of justice outweigh the best interests for the defendant and the public in a speedy trial at the time the trial date was set, but he is incorrect in stating that "to exclude time through 'ends of justice' analysis, the district court must not only do so prior to the clock running, but must also set forth detailed reasons in the record, prior to the deadline lapsing." (Docket No. 169 at 5).

"Although the Act is clear that the findings must be made, if only in the judge's mind, before granting the continuance . . . , the Act is ambiguous on precisely when those findings must be 'se[t] forth, in the record of the case.'" Zedner v. United States, 547 U.S. 489, 506-07 (2006). "However this ambiguity is resolved, at the very least the Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2)." Id. at 407; accord United States v. Patton, 651 F. App'x 423, 426 (6th Cir. 2016); United States v. Williams, 753 F.3d 626, 636 (6th Cir. 2014).

"When determining whether the ends of justice outweigh the public and defendant's interests in a speedy trial, the Act requires the district court to consider several factors, including '[w]hether the failure to grant such a continuance . . . would be 'likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice' and '[w]hether the failure to grant such

15

a continuance in a case . . . would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.'" United States v. Williams, 753 F.3d 626, 634-35 (6th Cir. 2014) (quoting, 18 U.S.C. § 3161(h)(7)(B)(i), (iv)).

In this case it was in the interest of justice to set the matter for trial on March 7, 2017, which, by Defendant's calculations, was a mere two weeks beyond the speedy trial deadline. The Government needed time to consider whether or not it should appeal this Court's granting of the request for a new trial, and/or seek a superseding indictment. Moreover, counsel's responses to the Court's inquiry about setting an earlier date suggested that he had other cases that were set for trial, and that he would need time for "effective preparation" to re-try this case. See United States v. Franklin, 622 F. App'x 501, 507 (6th Cir. 2015) (stating that "the district court has wide discretion in granting an ends of justice exclusion where defense counsel requests a continuance to allow defense counsel time to prepare for trial"); United States v. Strickland, 342 F. App'x 103, 110-11 (6th Cir. 2009) (affirming an ends of justice continuance where record showed, among other things, that court "had been 'advised by both the Government's and Defendant's attorneys' that they had a number of other previously scheduled matters rendering them unavailable for trial until the end of November").

**B.**

Finally, Defendant asserts that his Sixth Amendment right to a speedy trial right has been violated. This argument is never developed in his Motion and, in fact, the Sixth Amendment is mentioned only in the introductory paragraph when he states that the Motion is filed pursuant to that Amendment and the Speedy Trial Act. Perhaps this is because such an argument is wholly without

merit.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial and public trial." U.S. Const. amend. VI. The contention that a delay violates this requirement is considered "in light of four factors: 'Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" United States v. Marchbanks, 631 Fed. App'x 386, 390 (6th Cir. 2015) (quoting United States v. Howard, 218 F.3d 556, 563 (6th Cir. 2000)).

None of the foregoing factors weigh in Defendant's favor. First, the delay between the granting of a new trial and the scheduled trial date was not long. See United States v. Bass, 460 F.3d 830, 836 (6th Cir. 2006) ("The length-of-delay factor serves as a threshold inquiry: if the length of the delay is not 'uncommonly long,' then the judicial examination ends, but a delay of one year is presumptively prejudicial and triggers application of the remaining three factors."). Second, the reason for the delay is much more attributable to Defendant than the Government. See Maples v. Stegall, 427 F.3d 1020, 1026 (6th Cir. 2005) (citation omitted) (observing that "some reasons [weigh] more heavily than others" and "[t]he purpose of the inquiry is to determine 'whether the government or the criminal defendant is more to blame for [the] delay'"). Third, Defendant did not invoke his speedy trial right until after the deadline under the Speedy Trial Act allegedly passed. See United States v. Williams, 753 F.3d 626, 633-34 (6th Cir. 2014) (citation omitted) (observing that delay "is sufficient to 'cast doubt on the sincerity of [Defendant's] demand'"). Fourth, Defendant, who is not in custody, has made no showing of prejudice. See Barker v. Wingo, 407 U.S. 514, 532 (1972) (stating that purpose behind the requirement for a speedy trial is "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility

17

that the defense will be impaired.'").

## V.

Based on the foregoing, the Court will grant the Government's Motion to Strike Surplusage in the Indictment unless Defendant insists that the entire Indictment either be read or provided to the jury. The Court will deny Defendant's "Motion to Dismiss Remaining Counts of Indictment With Prejudice for Violation of Defendant's Speedy Trial Rights," as well as his "Motion to Dismiss Remaining Counts of Indictment With Prejudice for Violation of Double Jeopardy Clause."

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE